**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In Re:**<br><br>**CARE PAVILION OPERATING, LLC, *et al.*,[1]**<br><br>**Debtors.** | **Case No.: 24-70473-JAD**<br><br>**Chapter 11**<br><br>***Joint Administration Requested***<br><br>**Doc. No.:** |
| **CARE PAVILION OPERATING, LLC, *et al.***<br><br>**Movants,**<br><br>**-vs-**<br><br>**NO RESPONDENTS,**<br><br>**Respondents.** | **Related to Document No.:**<br><br>**Hearing Date:**<br><br>**Hearing Time:**<br><br>**Response Deadline:** |

**DECLARATION OF NEIL LURIA, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS**

I, Neil Luria, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer of each of the nine debtors (collectively, the "Debtors") and have served in this position since approximately November 18, 2024. Prior to that time, SOLIC Capital Advisors LLC ("SOLIC") served in a financial advisory role on behalf of the Debtors since approximately July 18, 2024. I am also the President of SOLIC and the head of SOLIC's restructuring and distressed asset support services divisions. I am an authorized officer

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Care Pavilion Operating LLC (7149); Cliveden Operating LLC (6546); MAPA Operating LLC (3750); Maplewood Operating LLC (0850); Milton Operating LLC (5523); Parkhouse Operating LLC (0140); Tucker Operating LLC (4305); Watsontown Operating LLC (0236); York Operating (2571). The Debtors' mailing address is 425 West New England Avenue, Suite 300, Winter Park, Florida 32789.

for purposes of executing all documents in connection with the Debtors' bankruptcy petitions and related documents.

2. As Chief Restructuring Officer ("CRO"), I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise indicated, the facts set forth in this declaration ("Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and consultants working under my supervision, or my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3. Each of the Debtors for which joint administration is sought have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") today (the "Petition Date"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court").

4. I submit this Declaration in support of the Debtors' voluntary petitions for relief and of the motions filed requesting "first day" type relief to minimize the potential disruptions that filing these Chapter 11 Cases may have on their operations (collectively, the "First Day Motions"). I am authorized to submit this Declaration on behalf of the Debtors.

5. Part I of this Declaration provides a high-level summary of the Debtors' objectives in these Chapter 11 Cases. Part II of this Declaration describes my background and experience. Part III of the Declaration describes the Debtors' businesses and organizational, financial, and operational structure. Part IV of this Declaration explains the Debtors' existing indebtedness and

obligations. Part V describes the events and the circumstances surrounding the filing of these Chapter 11 Cases. Part VI describes the DIP Financing Motion. Part VII sets forth the support of the Debtors' motions requesting emergency relief (the "First Day Motions").

## I. SUMMARY OF THE DEBTORS' OBJECTIVES IN THE CHAPTER 11 CASES

6. As a result of the Debtors' deteriorating financial condition, discussed further below, the Debtors retained professionals, including SOLIC, to advise the Debtors on how to restructure existing obligations and evaluate strategic alternatives to maximize value for the benefit of these bankruptcy estates and to ensure continuing, quality care to the residents of the Facilities.

7. The Debtors filed these Chapter 11 Cases in an effort to maintain the *status quo* while pursuing the following two key objectives: (1) obtaining new liquidity through the DIP Financing Motion (as defined below) that will be used to satisfy operational obligations of the Debtors and that will avoid the need for an immediate shutdown of the Facilities; and (2) selling the Debtors' operations under section 363 of the Bankruptcy Code to a new operating group who can continue the business as a going concern. The successful accomplishment of these objectives should provide the Debtors with an opportunity to develop and effectuate a chapter 11 exit strategy that will be in the best interests of the Debtors' bankruptcy estates and their creditors.

## II. MY BACKGROUND AND EXPERIENCE

8. I am currently the President of SOLIC. SOLIC is a professional services firm engaged in the business of providing restructuring, financial advisory, and distressed asset management services, with offices located in Winter Park, Florida, Chicago, Illinois, and Atlanta, Georgia. SOLIC provides restructuring, financial advisory, and distressed asset management services to a variety of businesses with a large range of enterprise values, including publicly traded and private companies.

9. Since its original engagement on behalf of the Debtors on July 18, 2024, SOLIC has been assisting the Debtors with respect to reviewing and assessing various financial elements of the Debtors' operations, managing liquidity, including identifying liquidity optimization strategies, and analyzing potential strategic alternatives. On November 18, 2024, the Debtors appointed me as CRO, and I have been serving in that capacity since my acceptance of that appointment on November 18, 2024.

10. SOLIC has widespread experience in providing restructuring and financial advisory services in reorganization proceedings. SOLIC's professionals have represented various stakeholders in distressed healthcare and non-healthcare situations over the last 15 years. I am also the Chief Restructuring Officer in the Pottsville Cases (defined below). Furthermore, I have previously served as the Chief Restructuring Officer in chapter 11 healthcare bankruptcies including serving as (a) Chief Restructuring Officer of Tamarac 10200 and Unipharma, LLC, Case No. 20- bk-23346-PDR (Bankr. S.D. Fla. 2020); (b) Chief Restructuring Officer of Sharity Ministries, Inc., Case No. 21-11001 (Bankr. Del. 2021); (c) Chief Restructuring Officer of Louisiana Medical Center and Heart Hospital, Case No. 17-10353 (Bankr. E.D. La. 2017), and (d) Chief Restructuring Officer of PBI Regional Medical Center, Case No. 06-16186 (Bankr. D.N.J 2006)). In addition, I served as Chief Restructuring of various non-healthcare chapter 11 cases including (a) *In re Ocala Funding, LLC*, Case No. 3:12-bj0945240-JAF (Bankr. M.D. Fla. 2012), and (b) *In re Taylor Bean & Whitaker Mortgage Corp.*, Case No. 3:09-bk-07047-JAF (Bankr. M.D. Fla. 2009). Furthermore, I have served as Chief Restructuring Officer and Chief Executive Officer of various other distressed healthcare and non-healthcare companies that have been restructured outside of chapter 11.

## III. DEBTORS' BUSINESSES AND STRUCTURE

### A. Description of the Debtors and their Business

11. Besides Bedrock Care LLC, the Debtors own and operate eight skilled nursing facilities in Pennsylvania (the "MAPA Facilities" or the "Facilities"). Collectively, those Debtors have 1,906 beds across the eight Facilities, and 1,472 residents currently at the Facilities as of the Petition Date (an approximate 77% occupancy rate). The Debtors acquired the Facilities in 2017. The Facilities are operated under the Bedrock Care name, but Bedrock Care LLC does not operate or own the Facilities.

12. Besides Bedrock Care LLC, the Debtors are all operating companies and lease their facilities under two master leases from several real estate investment trusts. The Master Leases are with the following entities as landlords: GA HC REIT II Royersford SNF, LLC; GA HC REIT II Watsontown SNF, LLC; GA HC REIT II Milton SNF, LLC; G&E HC REIT II Care Pavilion SNF, L.P.; G&E HC REIT II Maplewood Manor SNF, L.P.; G&E HC REIT II Cheltenham York SNF, L.P.; G&E HC REIT II Tucker House SNF, L.P.; and G&E HC REIT II Cliveden SNF, L.P. (collectively, the "Landlords"). By letter dated May 1, 2023, the Debtors were informed that SHI LL Holdco, LLC had succeeded in ownership to the landlords and to direct all future lease correspondence and notices to Ventas, Inc. ("Ventas"). The Master Leases are now administered by Ventas. Ventas is an arms-length third party landlord that is publicly traded.

13. There is one master lease for the five facilities in Philadelphia, dated June 30, 2011, and one for the other three facilities located in Milton, Watsontown, and Royersford dated April 30, 2013 (as amended, modified, renewed, restated, or supplemented, the "Master Leases"). These Master Leases were assigned to the Debtors when they acquired the Facilities. MAPA Operating LLC is the master tenant under the Master Leases. Care Pavilion Operating, LLC, Maplewood Operating, LLC, York Operating, LLC, Tucker Operating, LLC, Cliveden Operating, LLC, Milton

Operating, LLC, Watsontown Operating, LLC, and Parkhouse Operating, LLC are the subtenants of MAPA Operating LLC pursuant to separately executed subleases (the "Subleases").

14. Care Pavilion Operating LLC is a 396-bed facility in Philadelphia, Pennsylvania doing business as Care Pavilion Nursing and Rehabilitation Center. Maplewood Operating, LLC is a 180-bed facility located in Philadelphia, Pennsylvania doing business as Maplewood Nursing and Rehabilitation Center. York Operating, LLC is a 240-bed facility located in Philadelphia, Pennsylvania doing business as York Nursing and Rehabilitation Center. Tucker Operating, LLC is a 180-bed facility located in Philadelphia, Pennsylvania doing business as Tucker House Nursing and Rehabilitation Center. Cliveden Operating, LLC is a 180-bed facility located in Philadelphia, Pennsylvania doing business as Cliveden Nursing and Rehabilitation Center. Milton Operating, LLC is a 138-bed facility located in Milton, Pennsylvania doing business as Milton Nursing and Rehabilitation Center. Watsontown Operating, LLC is a 125-bed facility located in Watsontown, Pennsylvania doing business as Watsontown Nursing and Rehabilitation Center. Parkhouse Operating LLC is a 467-bed facility located in Royersford, Pennsylvania doing business as Parkhouse Nursing and Rehabilitation Center. In this Declaration and in the First Day Motions generally, these will be referred to as the Facilities or the MAPA Facilities.

**a. Organizational, Financial, and Operational Structure**

15. An organizational chart showing the relationship among the various Debtors is attached as **Exhibit 1**. As shown on the chart, besides Bedrock Care LLC, each of the Debtors is owned by Mr. Benjamin Landa, Mr. David Zahler, and Mr. Jacob Zahler. The sole member of Bedrock Care LLC is Mr. Jacob Zahler.

16. Besides Bedrock Care LLC, the Debtors are Pennsylvania limited liability companies. Bedrock Care LLC is a New York limited liability company. Besides MAPA Operating as the master tenant under the Master Leases and Bedrock Care LLC, each of the

Debtors operates a skilled nursing facility described above. Because of the overlapping ownership interests among the Debtors in these cases and the Pottsville Cases (defined below), the Debtors are affiliated, limited liability companies.

17. Bedrock Care LLC has no Bank Accounts, no Cash Management System, no secured debt, and no Employees. The only claims that are known against Bedrock Care LLC are litigation claims related to the MAPA Facilities and the facilities in the Pottsville Cases. Bedrock Care LLC is primarily used for its name, and the MAPA Facilities and the facilities in the Pottsville Cases are known as "Bedrock" facilities.

18. Upon information and belief, the Debtors are affiliates of the Debtors in the Pottsville Cases (defined below). In the Pottsville Cases, the parent company of the property-owning companies is PAMC Reality, LLC. PANHP Capital Group, LLC (an entity controlled by Mr. Landa) owns 42.5% of the interest in PAMC Reality LLC and JSZ Holdings LLC (an entity controlled by Mr. Jacob Zahler) owns 57.5% of the interest in PAMC Reality LLC. In the Pottsville Cases, the parent company of the operating companies is LZ PA Holdings LLC. LZ PA Holdings, LLC, is 100% owned by Mr. Jacob Zahler.

19. The Debtors maintain separate bank accounts that are utilized in the ordinary course of business (the "Cash Management System"). The Cash Management System currently consists of approximately 96 bank accounts (the "Bank Accounts") that are maintained at Bankwell, BankFinancial, Metropolitan Commercial Bank, CIBC, and PNC Bank. Additional information about the Cash Management System is set forth in the Cash Management Motion (defined below).

20. With respect to operational revenue, the MAPA Facilities derive the majority of their revenue from the residents residing in the Facilities.

21. Care Pavilion Operating, LLC, Cliveden Operating, LLC, Maplewood Operating, LLC, Milton Operating, LLC, Parkhouse Operating, LLC, Tucker Operating, LLC, Watsontown Operating, LLC, and York Operating, LLC are parties to a management services agreement with Focus Health Network, LLC ("Focus"), which generally provides that Focus will render management services for the MAPA Facilities.

## IV. EXISTING INDEBTEDNESS

### a. Secured Indebtedness

22. The Debtors have granted security interests in their assets or liens are filed against their assets as summarized in the chart below:

| Secured Creditor | Obligated Debtors | Approximate Outstanding Amount | Collateral |
|---|---|---|---|
| Dime Community Bank (Term Lender) | All (except Bedrock Care LLC) | $11,494,597 | Security interest in all of the Debtors' property and assets |
| Metropolitan Commercial Bank (Term Lender) | All (except Bedrock Care LLC) | $7,104,934 | Security interest in all of the Debtors' property and assets |
| BankFinancial, NA (AR Lender)[2] | All (except Bedrock Care LLC) | $0 | Security interest in all of the Debtors' property and assets |
| Landlords | All (except Bedrock Care LLC) | Accelerated lease obligations | Security interest in all of the Debtors' property and assets under the Master Leases (the Landlords' security interests are unperfected because they did not file financing statements); Letters of Credit from Metropolitan on behalf of the Debtors |

[2] BankFinancial was fully paid off pre-petition.

| | | | |
|---|---|---|---|
| SpecialtyRx | Care Pavilion Operating, LLC, York Operating, LLC, Tucker Operating, LLC, Milton Operating, LLC, Watsontown Operating, LLC, and Parkhouse Operating, LLC | $1,190,820 | Security interest in all personal property and business assets of the Debtor |
| IRS | MAPA Operating LLC | $16,998.76 | Federal tax lien |

23. The primary secured creditors are Dime Community Bank, Metropolitan Commercial Bank, BankFinancial, NA, and Ventas (who holds the Letters of Credit defined below). There is an intercreditor agreement between the Debtors' primary secured creditors that sets out the rights and priorities of each secured creditor to specific collateral (as amended, modified, renewed, restated, or supplemented, the "Intercreditor Agreement"). The Intercreditor Agreement generally provides that BankFinancial had priority on the AR Lender Priority Collateral (as defined in the Intercreditor Agreement, but generally the Debtors' accounts receivable); and Dime and Metropolitan had equal priority on the Term Lender Priority Collateral (as defined in the Intercreditor Agreement, but generally all other collateral of the Debtors). When the BankFinancial debt was discharged, Dime and Metropolitan would then have priority on the AR Lender Priority Collateral. The Intercreditor Agreement also provided that the Landlords were entitled to the Letters of Credit (defined below) and no other secured creditor had an interest in the Letters of Credit.

24. Metropolitan made an initial $11 million term loan to the Debtors, dated May 30, 2017 (as amended, modified, renewed, restated, or supplemented, the "Metropolitan Term Loan"). Metropolitan recorded UCC financing statements reflecting a security interest in the assets of the Debtors. As of the Petition Date, the outstanding amount of the Metropolitan Term Loan is reflected above and is about $7.1 million.

25. Dime made an initial $17.5 million term loan to the Debtors, dated May 30, 2017 (as amended, modified, renewed, restated, or supplemented, the "Dime Term Loan"). Dime recorded UCC financing statements reflecting a security interest in the assets of the Debtors. As of the Petition Date, the outstanding amount of the Dime Term Loan is reflected above and is about $11.475 million.

26. BankFinancial made an initial $17.5 million revolving loan to the Debtors, dated June 2, 2017 (as amended, modified, renewed, restated, or supplemented, the "BankFinancial Revolver Loan"). BankFinancial recorded UCC financing statements reflecting a security interest in the assets of the Debtors. The BankFinancial Revolver Loan matured on September 15, 2024, and as a result, BankFinancial used the Debtors' receivables to pay down its line of credit. As of the Petition Date, the outstanding amount of the BankFinancial Revolver Loan is reflected above and is zero.

27. The Master Leases granted the Landlords a security interest in all property and assets of the Debtors under the Master Leases. However, the Landlords have not filed UCC-1 financing statements. As of the Petition Date, the Debtors are delinquent in the rent due under the Master Leases and the Master Leases were accelerated. Pursuant to the Master Leases, there were two outstanding letters of credit (the "Letters of Credit") from Metropolitan to the Landlords on behalf of the Debtors—one in the face amount of $6,810,138.84 and one in the face amount of



4895-6874-8533.1

$2,597,598.36. The Letters of Credit were drawn and applied to rent for the months of July-October, and $2,497,335.42 remains outstanding on the Letters of Credit.

28. Specialty RX Inc. asserts a lien against Care Pavilion Operating, LLC, York Operating, LLC, Tucker Operating, LLC, Milton Operating, LLC, Watsontown Operating, LLC, and Parkhouse Operating, LLC. It filed a UCC financing statement on August 12, 2024, reflecting a lien on all personal property and business assets of those Debtors. The Internal Revenue Service filed a federal tax lien against MAPA Operating, LLC.

**b. Unsecured Debt & Other Obligations**

29. Each of the Debtors owes significant sums to vendors and other creditors for goods and services provided. The total number of known unsecured creditors is estimated to be approximately 825, and the total amount of unsecured debt owed by all Debtors is approximately $90 million. This consists of accounts payable, notes payable, other unsecured loans and claims, taxes, and assessments.

30. In addition, current and former residents or their representatives have also asserted claims against the Debtors alleging wrongful death, negligence, and related professional liability claims. This litigation is pending primarily in Pennsylvania state court, but there are other lawsuits across the country related to unpaid vendors and loans as well.

31. The Debtors also have potential obligations for nursing facility assessments (the "Nursing Facility Assessments") to the Commonwealth of Pennsylvania's Department of Human Services (the "Department"). The estimated potential total obligations are approximately $34 million through the quarter ending June 30, 2024. Nursing Facility Assessments continue to accrue at a rate of approximately $3.55 million per quarter. The Department has not recorded a lien against any of the Debtors with respect to the Nursing Facility Assessments.

**c. Debtors' Leases**

32. As stated earlier in this Declaration, the Debtors lease the MAPA Facilities under the Master Leases, which are administered by Ventas. MAPA Operating LLC is the master tenant under the Master Leases, and the remaining Debtors (besides Bedrock Care LLC) are the subtenants under the Subleases. The Master Leases include a buyout provision and right of first refusal in favor of MAPA Operating LLC. The Debtors have defaulted under the Master Leases, and the Letters of Credit have been drawn for rent in the months of July through October. The monthly lease payments for the Facilities under the relevant Master Leases are reflected in the chart below.

| | |
|---|---|
| Care Pavilion Operating, LLC | $590,925.37 |
| York Operating, LLC | $287,406.19 |
| Cliveden Operating, LLC | $162,952.23 |
| Maplewood Operating, LLC | $169,430.16 |
| Tucker House Operating, LLC | $212,820.86 |
| Milton Operating, LLC | $87,931.43 |
| Watsontown Operating, LLC | $52,318.66 |
| Parkhouse Operating, LLC | $402,730.28 |
| **TOTAL:** | **$1,966,515.18** |

**d. Unionized Facilities; Information regarding Employees**

33. As of the Petition Date, the Debtors employed approximately 1,715 people (collectively, the "Employees"). Most Employees are paid on an hourly basis, but some are paid a salary. Some Employees work part-time, but most work full-time. The Employees largely work at the Facilities in Pennsylvania. MAPA Operating LLC and Bedrock Care LLC have no employees.

The Employees and related obligations are discussed in more detail in the Wages Motion (defined below).

34. Certain Employees at the Facilities are subject to collective bargaining agreements. The agreements are with different unions and cover certain groups of employees. The Debtors have obligations to those employees under the CBAs, which are also discussed more fully in the Wages Motion. Certain CBAs require, for example, matching Employees' 401k contributions at year end. The following is a listing of the Debtors' collective bargaining agreements (the "CBAs"):

- Tentative Agreement between Bedrock Care Pavilion and SEIU Healthcare Pennsylvania (August 31, 2022 – May 31, 2025)
- Memorandum of Agreement – Service Agreement between Bedrock (Maplewood, Tucker House and Cliveden) and District 1199C NUHHCE, AFL-CIO (June 30, 2022 – June 30, 2025)
- Memorandum of Agreement – Licensed Practical Nurses between Bedrock (Maplewood, Tucker House and Cliveden) and District 1199C NUHHCE, AFL-CIO (June 30, 2022 – June 30, 2025)
- Agreement between York and Local 108R (June 12, 2022 – June 12, 2025)
- Labor Agreement between Milton Rehab and Nursing Center and Local 262 RWDSU – UFCW (January 1, 2023 – December 31, 2025)
- Labor Agreement between Watsontown Rehab and Nursing Center and Local 262 RWDSU – UFCW (January 1, 2023 – December 31, 2025

## V. CIRCUMSTANCES LEADING TO THE FILING OF THESE CASES

35. Like many other healthcare facilities and specifically skilled nursing facilities, the COVID-19 pandemic had a severe negative effect on the MAPA Facilities. Over the last five years, costs have increased dramatically for the MAPA Facilities. Additionally, due to the pandemic, skilled labor shortages resulted in increased staff wages and greater reliance on overtime pay and staffing agency needs. During this same period, resident headcounts at the facilities fluctuated and the reimbursement rates paid by the Commonwealth of Pennsylvania for many of the residents were not enough to keep up with the increased costs. Many residents of the MAPA Facilities are covered through Medicaid, and the reimbursement rate for Medicaid patients has reduced.

36. Besides the operational difficulties, recently, the BankFinancial Revolver Loan matured, and BankFinancial obtained the Debtors' receivables to pay down the BankFinancial Revolver Loan to its current balance of zero. This caused significant cash flow issues at the MAPA Facilities.

37. There is also significant litigation pending against the Facilities for various claims related to resident care and unpaid vendors. These lawsuits are in various stages of litigation and are causing an additional strain on the MAPA Facilities.

38. As stated earlier in the Declaration, each of the Debtors have potential obligations for Nursing Facility Assessments of approximately $34 million through the quarter ending June 30, 2024. There was a moratorium on paying these Nursing Facility Assessments during the COVID-19 pandemic, but that moratorium has since been lifted. Nursing Facility Assessments continue to accrue at a rate of about $3.55 million per quarter.

39. MAPA Operating also had a right of first refusal to buyout the properties on which the Facilities operate. On August 19, 2024, MAPA Operating received a letter from Ventas regarding a right of first refusal under the Master Leases (the "ROFR"). The ROFR also included a copy of a purchase and sale agreement the ("Property PSA") dated August 14, 2024, between the Landlords, on the one hand, and 6212 Walnut Realty LLC, Maplewood Manor Propco LLC, 7107 York Realty LLC, 6400 Greene Realty LLC, 743 Mahoning Realty LLC, 245 East Eighth Realty LLC, and 1600 Black Rock Realty, LLC (the "Property Purchasers"), on the other hand, wherein the Property Purchasers offered to purchase the properties for $150 million and provided a $10 million deposit. Upon information and belief, the Property Purchasers are unrelated to the Debtors. The Debtors were unable to exercise their right of first refusal within the 30 days provided

in the Master Leases due to cash flow constraints and the distressed nature of the operations. The Debtors understand that the Landlords intend to move forward with the Property PSA.

40. The Property Purchasers have identified new operators of the Facilities (the "Proposed New Operators"),[3] and the Debtors and Proposed New Operators have been negotiating an operations transfer agreement to handle the transition of the operations to the Proposed New Operators.

41. I understand that Eastern Union Healthcare Group ("Eastern Union") conducted an expedited marketing process pre-petition to find a buyer for the Debtors' operations. Eastern Union contacted potential acquirers in the Commonwealth of Pennsylvania. I understand that this process started in approximately June 2024, but Eastern Union was unable to identify any potential buyers for the Debtors' operations.

42. Pre-petition, the Debtors engaged Meridian Capital Group, LLC as broker. The Debtors will be filing an application to approve Meridian as their exclusive broker to continue marketing the Debtors' assets in an effort to find the best offer for the Debtors' assets and operations.

43. The Debtors' financial condition continues to deteriorate on a rapid basis. The Debtors can no longer operate without outside funding, and an operations transfer is the appropriate path forward to ensure resident care remains intact.

44. The best way to maximize the value of the Debtors' assets and ensure quality care to the Facilities' residents is through a transfer of the Debtors' assets as quickly as possible through

[3] The Proposed New Operators are: CL Operating, LLC (for the Cliveden facility); CP Operating, LLC (for the Care Pavilion facility); MA Operating LLC (for the Maplewood facility); MI Operating, LLC (for the Milton facility); PA Operating, LLC (for the Parkhouse facility); TH Operating, LLC (for the Tucker House facility); WA Operating, LLC (for the Watsontown facility); and YO Operating, LLC (for the York facility).

the Bankruptcy Court process. If the Debtors are unable to achieve the proposed sale through section 363 of the Bankruptcy Code, the Debtors will be faced with their only remaining choice—to stop operating the Facilities. This will be to the detriment of the residents and Employees at the Facilities.

45. To avoid ceasing operations, the Debtors intend to pursue a section 363 sale motion on an expedited basis. This motion will be filed shortly after the first day hearing.

46. With the exception of Bedrock Care LLC, the Debtors are all Pennsylvania limited liability companies. I understand that Pennsylvania limited liability companies are domiciled in the Commonwealth of Pennsylvania and are affiliates of the debtors in the pending cases *In re Pottsville Operations, LLC*, Case No. 24-7048 (the "Pottsville Cases"), and, accordingly, venue is proper in any Pennsylvania district and in this district.

## VI. DIP FINANCING MOTION[4]

47. The Debtors will seek the Court's authorization to use cash collateral and enter into a financing agreement with Argnt Holdings, LLC (the "DIP Lender") that generally provides the Debtors access to a priming senior securd post-petition loan facility of up to $9.7 million (the "DIP Financing Motion"). I executed a separate declaration in support of the DIP Financing Motion, which provides more details regarding the DIP Financing Motion.

## VII. SUPPORT FOR FIRST DAY MOTIONS AND APPLICATIONS

48. Concurrently with the filing of the Chapter 11 Cases, the Debtors the First Day Motions[5] as follows:

[4] Any capitalized terms not defined in this section shall have the meanings ascribe to them in the DIP Financing Motion.

[5] Any term not defined herein shall have the meaning ascribed to it in its respective First Day Motion.

- *Debtors' Motion for Emergency Consideration of First Day Motions* ("First Day Emergency Hearing Motion")

- *Debtors' Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures as well as Granting Related Relief* ("Case Management Motion")

- *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* ("Joint Administration Motion")

- *Debtors' Application for an Order Appointing Stretto, Inc. as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(A), and W. Pa. LBR 1002-8* ("Stretto Claims Agent Application")

- *Debtors' Application Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Administrative Agent, Nunc Pro Tunc to the Relief Date* ("Stretto Administrative Agent Application")

- *Debtors' Motion for Entry of an Order: (I) Extending the Time to File Schedules and Statements; (II) Authorizing Consolidated Creditor Lists and Matrix; (III) Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Privacy Rules and Establishing Patient Notice Procedures; (IV) Establishing Employee Notice Procedures; and (V) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases* ("Schedules and Noticing Motion")

- *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Benefits, and Other Compensation Obligations, (II) Authorizing Financial Institutions to Honor All Related Obligations, and (III) Granting Related Relief* ("Wages Motion")

- *Debtors' Motion Pursuant to Section 366 of the Bankruptcy Code, for Entry of Interim and Final Orders: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices; (B) Determining that the Utilities are Adequately Assured for Future Payment; and (C) Establishing Procedures for Determining Requests for Additional Assurance* ("Utilities Motion")

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue their Insurance and Surety Bond Programs, (II) Continue to Finance Insurance Agreements, (III) Pay All Prepetition and Post-Petition Obligations with Respect Thereto, and (IV) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Insurance Obligations* ("Insurance Motion")

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain their Cash Management System and Pay Bank Fees, (II) Waives Certain U.S. Trustee Requirements, and (III) Continue Using Existing Checks and Business Forms, and (B) Authorizing and Directing the Debtors' Bank to Honor all Employee Related Payment Requests* ("Cash Management Motion")

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Approving Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* ("DIP Financing Motion")

49. I have reviewed each of the First Day Motions, including the attachments thereto, and believe the facts set forth therein are true and correct, to the best of my knowledge, information, and belief, and based on the information provided to me by the Debtors and their employees. The facts set forth in the First Day Motions are incorporated herein to the extent necessary to support the relief requested. I believe that the relief sought in each of the First Day Motions is appropriate under the circumstances presented and necessary to preserve the assets and operations of the Debtors for the benefit of the estates and their creditors pending completion of the sale process and exit through the Chapter 11 Cases. The bases for seeking the relief sought in the First Day Motions is described in more detail below.

50. **First Day Emergency Hearing Motion**: The request for expedited hearings on the First Day Motions is caused by the nature of certain demands upon the Debtors immediately upon a bankruptcy filing, including, but not limited to, the need to: (i) obtain necessary post-petition financing; (ii) establish case management procedures; (iii) maintain and use their current cash management systems; (iv) pay prepetition wages, salaries, benefits, and other compensation to Employees; (v) prohibit utilities from altering, modifying, and/or discontinuing service and approving the proposed adequate assurance of future payments; (vi) authorizing payment of certain amounts required to maintain insurance; (vii) retain a claims and noticing agent; (viii) jointly

administer the Chapter 11 Cases for procedural purposes and with the Pottsville Cases; and (ix) extend the time for filing schedules of assets and liabilities, the statement of financial affairs, and creditor lists and matrices as well as to file consolidated creditor lists and matrices. Emergency consideration is warranted to prevent serious disruption to the Debtors' businesses. I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and it will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.

51. **Case Management Motion**: These Chapter 11 Cases require special scheduling and procedures because of a combination of factors, including, but not limited to (i) the number of debtors; (ii) the need for expedited hearings for consideration of case management and administrative orders and other "first day" motions, (iii) the size of the Chapter 11 Cases, (iv) the large number of parties in interest in the Chapter 11 Cases, and (v) the need for special noticing and hearing procedures. I understand that the Complex Chapter 11 Cases Procedures include a variety of procedures intended to promote judicial economy and to enhance the procedural predictability for the Court, the Debtors, creditors, and all interested parties in complex chapter 11 cases. Accordingly, I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and it will make the Debtors' Chapter 11 Cases more efficient and orderly.

52. **Joint Administration Motion**: The Debtors have filed a motion requesting entry of an order directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only and with the Pottsville Cases. I believe the joint administration of these Chapter 11 Cases and with the Pottsville Cases will dispense with the need for duplicative notices, motions, applications, hearings, and orders and will save the Debtors and interested parties considerable

time and expense. In addition, the 30 largest unsecured creditors in both cases overlap substantially (with 16 unsecured creditors being the same across both cases and 8/10 of the top 10 creditors being the same across both cases), as does ownership and the guarantors of the secured debts. Attached as **Exhibit 2** is a comparison of the 30 largest unsecured creditors across both cases. The Unsecured Creditors Committee appointed on October 25, 2025, in the Pottsville Cases already has proposed counsel and advisors. Additionally, three of the Unions overlap with the Pottsville Cases. I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and it will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.

53. **Stretto Claims Agent Application and Stretto Administrative Agent Application**: The Debtors have filed emergency applications requesting that the Court approve the Debtors' retention of Stretto, as a claims and noticing agent and to assist with the preparation of the Debtors' schedules and SOFAs. I believe the retention of a claims and noticing agent is necessary primarily to (i) handle the significant burden of noticing interested parties, including the Debtors' employees, residents, vendors, and litigation parties and (ii) handle the potentially voluminous proofs of claim filed in these Chapter 11 Cases. I also believe the retention of Stretto to assist with the schedules and SOFAs is necessary and appropriate in these cases to ease the significant burden that compiling the schedules and SOFAs will place on the Debtors' employees. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

54. **Schedules and Noticing Motion**: The Debtors have filed an emergency motion for extension of time to file their schedules and SOFAs. I believe cause exists to extend this deadline because the Debtors have not had sufficient time to assemble the financial data and other

information required. The Debtors will also require the assistant of Stretto to assist with this process. Working with Stretto, the Debtors must thoroughly examine their books, records, and documents, which will require substantial time and effort. Additionally, filing these Chapter 11 Cases will impose significant and additional duties on the Debtors' workforce that would be responsible for assembling the Debtors' schedules and SOFAs. A brief extension will aid the Debtors in filing complete and accurate schedules and SOFAs, which will benefit all parties in these Chapter 11 Cases. Additionally, the limited notice requested to Employees and residents will further benefit the Debtors' bankruptcy estates and all interested parties, while giving residents and Employees proper notice of the filing. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

55. **Wages Motion**: The Debtors have filed an emergency motion requesting the authority to pay certain pre-petition obligations due to the Debtors' Employees. The Debtors request authority pay the Employees' prepetition wages and honor certain employee policies (for example, paid time off and health and welfare obligations). The Debtors' next payroll dates are November 22, November 29, December 6, and December 13—which all include a pre-petition portion of a pay period. It is critical to the Debtors' ability to continue operating the Facilities and preserving estate assets that they timely pay their Employees. If the Debtors are not permitted to fulfill their obligations to Employees, the Employees will not receive full payment for services that have already been performed. I believe such a result would undermine the morale and loyalty of the Debtors' workforce, and substantially jeopardize the Debtors' bankruptcy efforts. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

56. **Utilities Motion**: The Debtors have filed an emergency motion requesting that the Court determine that the Debtors have provided adequate assurance of payment for certain utility services and preclude these utility providers from altering, refusing, or discontinuing utility services. The monthly average cost of these utility services combined is approximately $300,768. In my opinion, the continuity of these utility services is essential for the Debtors to preserve and prevent damage to the value of the Debtors' estates. I believe a deposit payable to each utility provider in an amount equal to one half of the Debtors' monthly average utility bill is appropriate adequate assurance of payment for these utility services. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

57. **Insurance Motion**: The Debtors have filed an emergency motion requesting authority but not direction to continue operating its Insurance Program (as defined in the Motion) and pay certain pre-petition Insurance Program expenses to keep the insurance policies in place. The Debtors' Insurance Program is essential to the continued operation of the Debtors' businesses. This relief is critical to preserve the status quo and ensure continued patient care at the Facilities. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

58. **Cash Management Motion**: The Debtors have filed an emergency motion requesting that the Court authorize the Debtors to continue using their prepetition cash management system, including existing bank accounts and business forms. The Debtors maintain a cash management system in the ordinary course of the Debtors' businesses. This system allows the Debtors to identify the Debtors' cash requirements, transfer cash as needed, forecast cash needs, maintain accounting records, and pay necessary expenses. I believe that discontinuing the use of the Debtors' existing cash management system would require a significant amount of time

and effort and could negatively impact the Debtors' ability to efficiently fund necessary expenses and preserve assets of the estates. These negative results would ultimately adversely affect the Debtors' ability to maximize the value of their estates for the benefit of all interested parties. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

59. **DIP Financing Motion**: The Debtors require immediate access to funding to preserve the assets of the estates for the benefit of creditors and ensure the protection of the residents of the Facilities. The Debtors will seek the Court's authorization to use cash collateral and enter into a financing agreement with the DIP Lender that generally provides the Debtors access to a post-petition loan facility of up to $9.7 million. I also executed a separate declaration in support of the DIP Financing Motion, which provides more details regarding the DIP Financing Motion. I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors. It will also provide the necessary financing to fund the Chapter 11 Cases and achieve the Debtors' bankruptcy goals.

*This 18th day of November 2024.*

*/s/ Neil Luria*
Neil Luria